Judgment rendered December 3, 2025
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,543-CA
No. 56,544-CA
No. 56,545-CA
No. 56,546-CA
No. 56,547-CA
No. 56,548-CA
(Consolidated cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

No. 56,543-CA

JU'KADYNN CARTER                                    Plaintiff-Appellee

versus

STEVE HOLLOWAY                                      Defendant-Appellant

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 85,753

Honorable Nicholas E. Gasper, Judge

* * * * *

SMITHERMAN, HILL & BRICE, L.C.   Counsel for Appellant
By: F. Weber Hill

JU'KADYNN CARTER                                    In Proper Person

* * * * *

Before PITMAN, STEPHENS, and MARCOTTE, JJ.

STEPHENS, J., concurs in the result.

**MARCOTTE, J.**

These consolidated civil appeals arise out the 42nd Judicial District Court, Parish of DeSoto, the Honorable Amy Burford McCartney and the Honorable Nicholas E. Gaspar presiding. Defendant Steve Holloway ("Holloway, Sr.") appeals the trial court's granting of three protective orders against him. Defendant Stevie Holloway ("Stevie") also appeals the trial court's granting of three protective orders against him. For the following reasons, we affirm in part, reverse in part, and remand with instructions. A separate opinion is issued for each protective order.

## FACTS AND PROCEDURAL HISTORY

Because the facts for each protective order arise out of the same series of events, and the same assignments of error are alleged in each appeal, the facts, arguments, relevant law, and analysis for the six protective orders will be provided in this opinion, and the companion memorandum opinions will reference this opinion.

On January 3, 2025, Ju'Kadynn Carter ("Carter") filed two petitions for protective orders against Holloway, Sr., and his son, Stevie (together, "the Holloways"), alleging in each petition that on January 1, 2025, the pair approached Kylin Boykins ("Boykins"), Carter's brother, at the Blink's Quick Stop Store/Whataburger ("Blinks") in Joaquin, Texas, believing he was Carter. Carter said that the Holloways "swung on" Boykins and that Holloway, Sr. later "pulled a gun while Stevie had a bat." He alleged that the Holloways were determined to hurt Boykins "or do something bad to him [because] they even chased [Boykins] from Joaquin to Logansport." He

alleged that there was a "big fight" in 2024, in which Stevie and Carter were involved.

On January 3, 2025, Tyshequa Boykins ("Tyshequa") filed on behalf of her minor son, Boykins (DOB: 6-13-08), two petitions for protective orders against Holloway, Sr. and Stevie. She alleged that on January 1, 2025, while at Blink's, Holloway, Sr. instructed Stevie to attack Boykins believing him to be his brother, Carter. Tyshequa stated that Holloway, Sr. continued to chase Boykins with a gun to his vehicle and toward his residence. She said that the incident resulted in Boykins having to go to the hospital with a bruised eye and a cut on his foot. She said Stevie used a bat to charge at Boykins. She also alleged verbal abuse by making racial comments.

On January 3, 2025, Cratelyn Henderson ("Henderson") filed two petitions for protective orders against Holloway, Sr. and Stevie alleging that, on January 1, 2025, "[Holloway, Sr.] approached me. He used profane language, shoved, and punched me. The defendant also pulled a weapon, which I perceived to be a gun, threatening my life." He said that Stevie approached him holding a bat and threatened to harm him. Henderson said that there was a prior incident in class where Stevie threw things at him and slapped him in the head. Henderson said that, in turn, he pushed Stevie.

On January 16, 2025, Carter, Henderson, and Tyshequa on behalf of Boykins each filed two new petitions for protection from stalking against the Holloways alleging the same facts.

On January 16, 2025, Judge McCartney held a hearing on the petitions for a protective order that Boykins and Henderson filed against Stevie.

2

Henderson testified that on January 1, 2025, he and Boykins were at Blink's/Whataburger in Joaquin, Texas purchasing food when they heard Holloway, Sr. say to his son, "Get him, get him." Henderson continued to shop, and Boykins approached him, asking him what the Holloways were doing. Henderson asked the Holloways what they were doing, and the father and son began following Boykins and Henderson around the store. Henderson testified that Stevie swung at Boykins, and a fight ensued. Henderson told Holloway, Sr. to "get your son," but he refused. Henderson stated that the Holloways seemed to think that Boykins was his brother, Carter, because Holloway, Sr. referred to Boykins as "Smelly," which was Carter's nickname.

Henderson stated that he and Boykins ran from the store and the Holloways chased them outside. Henderson and Boykins got into Henderson's car; Boykins then said that he left his phone in the store, so he exited the car to retrieve it. The Holloways, who had gotten into their truck, then exited their vehicle with weapons. Stevie had a bat and Holloway, Sr. "had something in his hand," which Henderson believed to be a gun. Henderson testified that the Holloways moved toward his car; he got out of the car to protect Boykins, a minor. Boykins ran back to the car, got inside, and fled, leaving Henderson behind. The Holloways gave chase.

Henderson said the only prior incident was that one day in class, Stevie hit him in the back of the head. He told the teacher, and Stevie was moved to a different seat and given in-school suspension. On cross-examination Henderson said he was aware that Stevie was charged with a crime for the incident at Blink's, but he was not informed that there was a

no-contact order in place in Shelby County, Texas, where Blink's was located.

Boykins' testimony was the same as Henderson's. He said that as he was running away, a woman who was with the Holloways grabbed his hoodie to try to let Stevie get close to him and "jump on me." He affirmed that Holloway, Sr. exited his vehicle with a handgun. Boykins left in the car, and the Holloways followed him to Logansport. Boykins said that he "almost got hit off the bridge by Stevie and his dad." He returned to the store and stayed there until police arrived. He stated that he went to the hospital because he had a headache and his eye was swollen.

The trial court granted Boykins' and Henderson's protective orders from stalking against Stevie. The trial court stated that it found that Stevie's behavior of following the pair around the store, exiting the store and getting into his vehicle, and then exiting the vehicle to go after Boykins again, to fit within the legal definition of stalking because he repeatedly followed them.

Also on January 16, 2025, Judge Gasper held a hearing on Carter's petition for protection from stalking against Stevie. Carter testified that on January 1, 2025, he received a call from Boykins saying he got into a fight with Stevie. Carter said that he and Stevie had a "big fight" in February 2024, but they had not had any problems since. Carter and Stevie played football together in high school. Carter said he worked at the Whataburger in Joaquin, where the incident occurred, and had seen Stevie there several times, but there was never a confrontation between them. Carter said he had had no contact with Stevie since the January 1, 2025, incident. Carter affirmed that his nickname was "Smelly." Boykins and Henderson testified

4

that Holloway, Sr. repeatedly said to Stevie, "Get Smelly," while at the truck stop, trying to get Stevie to attack Boykins. Defense counsel argued that Stevie knew Carter from football and school, so he knew the difference between Carter and his brother.

The trial court stated that while Stevie's previous visits to Carter's workplace did not result in threats of harm, the Holloways' later actions threatened him. The trial court pointed out that the January 1, 2025, incident occurred at Carter's workplace, and he was the focus of the Holloways' threats. The trial court granted the protective order against Stevie. The three protective orders stated that Stevie was not allowed to own, possess, or purchase any firearms. They were put in place for two years.

On January 24, 2025, a hearing on the three petitions for protective orders against Holloway, Sr. was held in front of Judge Gasper. Henderson provided similar testimony to what he gave at the hearings on January 16, 2025. He added that when Stevie was threatening Boykins inside the store, Holloway, Sr. picked up a plastic "wet floor" sign and threatened to hit Henderson with it if he intervened. Boykins provided the same testimony as he did in Stevie's case. Carter stated that in February 2024, he attended a bonfire party with several other people. He said Stevie was drunk and called one of his friends a racial slur and "ran up on my friend, and then that's when the fight broke out." The petitioners said that the Holloways had not contacted them since the incident.

In each case, Holloway, Sr. argued that there was no stalking because what occurred at Blink's was an isolated incident and did not constitute repeated following of an individual. The trial court granted the petitioners'

5

protective orders against Holloway, Sr., finding that the events that occurred on January 1, 2025, constituted stalking. In Carter's case, the trial court added that he was the focus and aim of the Holloways' actions, so the stalking statute applied. The protective orders were put in place for two years. They stated that Holloway, Sr. was not allowed to own, possess, or purchase any firearms. The Holloways now appeal.

## DISCUSSION

*Stalking Under La. R.S. 14:40.2*

In their first assignments of error, the Holloways argue that the district court erred in failing to apply the definition of stalking to the particular facts of their cases. They contend that La. R.S. 14:40.2 defines stalking as "intentional and repeated following or harassing." Appellants reason that their actions on January 1, 2025, at Blink's did not fit the legal definition of stalking. They state that their actions constituted one continuous act. They also argue that Carter was not present for the incident, so there was no repeated following and harassing in his case.

A trial court's decision to grant or deny a protective order will not be reversed on appeal absent an abuse of discretion. *Truelove v. Isaacs*, 56,152 (La. App. 2 Cir. 4/9/25), 409 So. 3d 456, *writ denied*, 25-00477 (La. 9/10/25), 415 So. 3d 1278. The trial court, sitting as a trier of fact, is in the best position to evaluate the demeanor of the witnesses, and its credibility determinations will not be disturbed on appeal absent manifest error. *Whatley v. Garrison*, 56,311 (La. App. 2 Cir. 7/16/25), __ So. 3d __, 2025 WL 1945304.

6

Louisiana Revised Statute 46:2171, *et seq.*, known as the "Protection from Stalking Act," was enacted to provide a civil remedy for stalking victims against perpetrators, offering immediate and easily accessible protection. *Raymond v. Lasserre*, 22-0793 (La. App. 1 Cir. 3/6/23), 368 So. 3d 82, *writ denied*, 23-00893 (La. 10/31/23), 372 So. 3d 335. Under the Act, "stalking" means any act that would constitute the crime of stalking under La. R.S. 14:40.2. *Id*. The crime of stalking is:

> [T]he intentional and repeated following or harassing of another person that would cause a reasonable person to feel alarmed or to suffer emotional distress. Stalking shall include but not be limited to the intentional and repeated uninvited presence of the perpetrator at another person's home, workplace, school, or any place which would cause a reasonable person to be alarmed, or to suffer emotional distress as a result of verbal, written, or behaviorally implied threats of death, bodily injury, sexual assault, kidnapping, or any other statutory criminal act to himself or any member of his family or any person with whom he is acquainted.

La. R.S. 14.40.2(A).

> The statute goes on to provide:
>
> (1) "Harassing" means the repeated pattern of verbal communications or nonverbal behavior without invitation which includes but is not limited to making telephone calls, transmitting electronic mail, sending messages via a third party, or sending letters or pictures.
>
> (2) "Pattern of conduct" means a series of acts over a period of time, however short, evidencing an intent to inflict a continuity of emotional distress upon the person. Constitutionally protected activity is not included within the meaning of pattern of conduct.

La. R.S. 14:40.2(C).

Despite the Protection from Stalking Act's reference to the criminal stalking statutes, petitions for protection from stalking are not criminal proceedings. *Truelove v. Isaacs*, *supra*. Rather, the sole relevance of the

criminal stalking statutes in the context of a petition filed under the Act is to provide the definition of stalking. *Raymond v. Lasserre, supra*. At a hearing on a protective order, a petitioner must prove the allegations by a preponderance of the evidence. *Id*. Proof is sufficient to constitute a preponderance of the evidence when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not. *Id*.

The Holloways cite several cases in support of their assertions that their actions constituted one continuous act and not a repeated following under La. R.S. 14:40.2. First, defendants cite *Selcer v. Boudreaux*, 20-623 (La. App. 3 Cir. 5/26/21), 318 So. 3d 393, where the trial court issued an order of protection from stalking against Boudreaux in favor of his aunt, Selcer. Boudreaux and his mother left on the door to the house where he and Selcer lived, a summary of hurtful comments Selcer had made to her nephew. On a later date, Selcer hit Boudreaux in the face while trying to slap a phone out of his hand. Boudreaux then followed his aunt through the house, where both were staying, until she told him not to touch her, at which point her nephew kicked her several times. *Id*.

Boudreaux immediately moved out of the house. The court of appeal found that there was no evidence that the nephew intentionally and repeatedly followed his aunt, constituting stalking. Boudreaux had immediately moved out of the house where Selcer was staying after the incident where he kicked her. The court noted that Selcer was obviously not afraid of him as she returned to stay at the home where they both lived after

8

he left the note for her on the door of the house. The court reversed the granting of the protective order. *Id*.

The Holloways also cite *State v. Rico*, 99-158 (La. App. 3 Cir. 6/2/99), 741 So. 2d 774, *writ denied*, 99-1883 (La. 12/10/99), 751 So. 2d 244, in which Rico was convicted of stalking. One evening, the victim, Suzanne, returned to her mother's home with her mother, Charlotte, and her child. While she was unloading her vehicle, Rico drove past the home, leaned out of the window, and said, "Hey baby" to Suzanne. She then got into her vehicle to return to her home. Rico pulled over to the side of the road, and as Suzanne passed him in her vehicle, he began following her. Suzanne noticed Rico following her, went to her house, which was a few blocks away, and went inside to get her brother into the car. Suzanne left and Rico continued to follow her. To lose him, she pulled around the fish market, but the defendant proceeded behind her. *Id*.

Charlotte, out of concern for her daughter, followed Rico. Charlotte told Suzanne to go to a nearby café. Charlotte followed defendant and recorded his license plate number. Rico stopped, exited his vehicle, and asked if Charlotte had a problem. Charlotte then left to meet her children. The First Circuit reversed the conviction finding that the word "repeated," as found in the La. R.S. 14:40.2 (C)(1) definition of "harassing," meant "renewed or occurring again and again." *State v. Rico, supra* at p. 5, 741 So. 2d at 777. The court said that Rico's conduct was not a renewed or recurring following, but rather a continuous following which occurred once. The court also found that Rico had not verbally threatened Suzanne, the person he had been following. *State v. Rico, supra*.

9

Defendants further cite *State v. Ryan*, 07-504 (La. App. 3 Cir. 11/7/07), 969 So. 2d 1268, in which the defendant was convicted of stalking and the Third Circuit reversed his conviction. Ryan parked his vehicle in front of the victims' residence for two minutes and drove past the house several times in a single day. The court said that frequenting areas where and at times the alleged victim would typically be present did not constitute "following." The court stated that Ryan did not pursue the victims, so the state failed to establish a "following" in that instance. The court found that the state did not establish that Ryan willfully, maliciously, repeatedly, and uninvitedly was at someone's home and making verbal or behaviorally implied threats that would cause a reasonable person to become alarmed or suffer emotional distress. The court stated that Ryan was traveling on public roadways, which was constitutionally protected activity. *Id*.

We do not find that the trial court abused its discretion here. The criminal stalking statute, La. R.S. 14:40.2, which defines "stalking," provides that stalking involves a "series of acts over a period of time, *however short*, evidencing an intent to inflict a continuity of emotional distress." We find those elements present here. The Holloways followed Boykins and Henderson around Blink's, making verbal threats. Stevie, at the behest of his father, attacked Boykins, a 16-year-old child. That altercation ended when the parties left the store and got into their respective vehicles. Boykins left Henderson's vehicle to retrieve his phone. The Holloways then exited their vehicles, armed with a baseball bat and a gun. Henderson exited his vehicle to protect Boykins. Boykins, in fear, got back

10

into Henderson's car and drove away. The Holloways got into their truck and gave chase, attempting to run Boykins off a bridge.

We find those facts sufficient to say that there was an intentional and repeated following of Boykins and Henderson that would cause them to feel alarmed or suffer emotional distress. The Holloways terrorized a child and his friend. What this court finds even more disturbing is that the true target of the Holloways' behavior was Carter, Boykins' brother. Stevie played football and attended school with Carter, so the two were familiar with each other. At Blink's, Stevie likely knew that Boykins was not Carter, but he attacked him anyway because his father told him to.

We likewise find the trial court granting Carter's petitions for protective orders appropriate. Louisiana Revised Statute 14:40.2 states that stalking also includes behaviorally implied threats of bodily injury against any member of the victim's family. Here, Holloway, Sr. told his son to "Get Smelly," referring to Carter. While Carter was not present, the Holloways were at his workplace, and he was their intended target. They attacked Boykins, Carter's brother, proclaiming that he was Carter.

We find this case dissimilar to those cited by the Holloways. In *Selcer v. Boudreaux*, *supra*, the parties did not leave the premises, and there was no marked end to the altercation between Selcer and Boudreaux. The court also found that Selcer was not afraid of Boudreaux. In *State v. Rico*, there was no point at which the defendant stopped following the victim and then began again. The court also said that Rico had not made verbal threats.

Here, there were three distinct acts that together constituted stalking for the purposes of issuing the protective orders: (1) the Holloways attacked

11

Boykins and Henderson in the store and then got into their truck; (2) the Holloways exited their vehicle while armed to renew their attack on Boykins and Henderson; and (3) the Holloways got into their vehicle and followed Boykins in their truck and tried to run him off the bridge. Here, Boykins and Henderson testified about their emotional distress during and after their altercations with the Holloways. Carter expressed his alarm at knowing the Holloways attacked his brother and that he was the intended target of that violence.

In *State v. Ryan*, *supra*, the court found that Ryan had the constitutional right to park his vehicle on the street and drive in front of the victims' house. The Holloways' conduct in attacking Boykins and Henderson, threatening them while armed, and then attempting to drive Boykins off the road was not constitutionally protected activity. We find that the trial court was correct in granting the protective orders. We affirm that part of the court's ruling granting Carter's protective order against Holloway, Sr.

*Possession of Firearms*

The Holloways next argue that the trial court erred in finding that, as part of the protective orders against them, they could not possess firearms. They state that La. R.S. 46:2136.3 prohibits a defendant from possessing a firearm for the duration of a protective order when he represents a "credible threat to the physical safety of a family member, household member, or dating partner." They contend that there exists no such relationship between them and the plaintiffs; therefore, they are not members of the protected class contemplated by the statute. They also argue that the court erred by

12

incorrectly interpreting La. C. Cr. P. art. 1001, which concerns the transfer of firearms only after La. R.S. 46:2136 applies.

Louisiana Revised Statute 46:2136.3 provides that any person against whom the court has issued a protective order pursuant to the provisions of La. R.S. 46:2173 shall be prohibited from possessing a firearm or carrying a concealed weapon for the duration of the protective order if it includes a finding that both (1) the person subject to the protective order represents a credible threat to the physical safety of a family member, household member, or dating partner; and (2) the protective order informs the person subject to the protective order that he is prohibited from possessing a firearm pursuant to the provisions of 18 U.S.C. 922(g)(8) and La. R.S. 46:2136.3.

"Family member" means spouses, former spouses, parents, children, stepparents, stepchildren, foster parents, foster children, other ascendants, and other descendants. "Family member" also means the other parent or foster parent of any child or foster child of the offender. La. R.S. 14:35.3. "Household member" means any person presently or formerly living in the same residence with the offender and who is involved or has been involved in a sexual or intimate relationship with the offender, or any child presently or formerly living in the same residence with the offender, or any child of the offender regardless of where the child resides. *Id*.

"Dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not

13

include a casual relationship or ordinary association between persons in a business or social context. La. R.S. 14:34.9.

We find that the trial court erred in determining that the Holloways were prohibited from possessing firearms for the duration of the protective orders. The petitioners were not family members, household members, or dating partners of the Holloways; no evidence was submitted to the court showing the presence of such a relationship. Therefore, we reverse that part of the trial court's order prohibiting Holloway, Sr. from possessing firearms in the protective order in favor of Carter.

*Duration of the Protective Orders*

Lastly, the Holloways argue that the trial court erred in granting the protective orders for two years. They maintain that La. R.S. 46:2136(F)(1) provides that the duration of a protective order cannot exceed 18 months.

Any final protective order or approved consent agreement shall be for a fixed period, not to exceed 18 months, and may be extended by the court, after a contradictory hearing, in its discretion. Such protective order or extension thereof shall be subject to a devolutive appeal only. La. R.S. 46:2136(F).

Here, no contradictory hearings were held prior to the court issuing the protective orders preventing the Holloways from having contact with the petitioners for two years. While the trial court may, after a contradictory hearing is conducted, extend the fixed period, it may not do so prior to the hearing. We find that the trial court improperly extended the period for each protective order. We therefore remand for the trial court to reduce the fixed

14

time to the maximum allowable period in accordance with La. R.S. 46:2136(F). *See Whatley v. Garrison, supra.*

## CONCLUSION

For the reasons stated herein, the trial court's granting of Ju'Kadynn Carter's protective order against Steve Holloway is affirmed in part, reversed in part, and remanded in accordance with this opinion. The cost of the appeal is assessed to appellant.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED WITH INSTRUCTIONS.**